UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN INCH, | : | |
| Executor of the Estate of JAMES R. | : | JURY TRIAL DEMANDED |
| ROUSE a/k/a/ JAMES RICHARD | : | |
| ROUSE, | : | NO.: _____ |
| | : | |
| Plaintiff, | : | |
| | : | (JUDGE _____) |
| v. | : | |
| | : | |
| LACKAWANNA COUNTY, CHAD | : | |
| NOLDY, LEE MYERS, JOSEPH | : | |
| GORTON, BERNARD GERVASI, | : | |
| CORY JORDAN, JOSEPH | : | |
| LAORANTI, JR., ROBERT | : | |
| GETHING, MARTIN ADDLEY, | : | |
| STEVEN YEARING, DARSHAN | : | |
| PATEL, NICHOLAS CIMINO, | : | |
| MICHAEL MITCHELL, KENNETH | : | |
| RAYMOND, ARTHUR NOLDY, | : | |
| OFFICER M. JONES, PAUL | : | |
| GOLDEN, ROBERT MAZZINO, | : | |
| BRYAN HUGHES, DAVID KIZER, | : | |
| WILLIAM MICHEL, TRENT | : | |
| ANTOINE, DAVID PINKLETON, | : | |
| CHRISTOPHER KUPINSKY, | : | |
| TYLER LIPINSKI, OFFICER | : | |
| HARINA, ROBERT HORAN, | : | |
| LEE KACZMAREK, JERUD LOCH, | : | |
| ANTHONY WESLEY, FRANKLIN | : | |
| WINSTEAD, SCOTT OHMNACHT, | : | |
| JOSHUA KILHULLEN, NATHAN | : | |
| DAVIS, JOSHUA SARNOSKI, | : | |
| KYLE MULRAIN, TAYLER | : | |
| LOCKER, GARY KOZLOWSKI, | : | |
| OFFICER CARAMONO, ANTHONY | : | |

1

YERKA, JR., JOHN DODGSON,          :
KEVIN DOLPHIN, WILLIAM             :
ZINDLE, SHAMUS MCANDREW,           :
ROBERT DUTKEVITCH, PAT             :
GOLDEN, JASON ORTONA,              :
OFFICER M. LORD, CHAD              :
BIDWELL, KATIE PERNOT,             :
LAVERNE GARRETSON,                 :
KIMBERLY STEWARD, MICHELE          :
JONES, SAMANTHA BROWN,             :
BRANDEE MCCARTHY, HOLLY            :
BAGASKI, AMANDA                    :
TRZENIOWSKI, JADA                  :
GREENFIELD, DEVIN                  :
MCANDREW, JENISE COLLINS,          :
JESSICA DELGADO-DAYS,              :
and STEPHANIE LOCKHART,            :
                                   :
            Defendants,            :
                                   :
               &                   :
                                   :
Wellpath Holdings, Inc. Liquidating  :
Trust, Matthew J. Dundon, Trustee,   :
                                   :
        Nominal Defendant.         :

## **COMPLAINT**

Plaintiff Stephen Inch, Executor of the Estate of James R. Rouse a/k/a James Richard Rouse ("Mr. Rouse"), by and through his attorneys, Barry H. Dyller, Chad J. Sweigart, and Dyller & Solomon, LLC, brings this action related to the deprivation of Mr. Rouse's federally-protected rights and in support thereof, alleges as follows:

## JURISDICTION AND VENUE

1.      This action arises out of violations of the United States Constitution brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.*

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12133, and 29 U.S.C. § 794a(a)(2).

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

4.      Plaintiff is Stephen Inch ("Mr. Inch") as the Executor of the Estate of his late uncle, Mr. Rouse, acting pursuant to Letters Testamentary issued to him by the Sullivan County Register of Wills on February 29, 2024.

5.      At the time of his death on December 29, 2023, Mr. Rouse was an adult individual domiciled in Sullivan County, Pennsylvania.

6.      Defendant Lackawanna County (the "County") is a municipality in Pennsylvania and owns and controls the Lackawanna County Prison ("LCP").

7.      Defendant Chad Noldy was at all times hereto employed by the County as a correctional officer at LCP.

8. Defendant Lee Myers was at all times hereto employed by the County as a correctional officer at LCP.

9. Defendant Joseph Gorton was at all times hereto employed by the County as a correctional officer at LCP.

10. Defendant Bernard Gervasi was at all times hereto employed by the County as a correctional officer at LCP.

11. Defendant Cory Jordan was at all times hereto employed by the County as a correctional officer at LCP.

12. Defendant Joseph Laboranti, Jr. was at all times hereto employed by the County as a correctional officer at LCP.

13. Defendant Robert Gething was at all times hereto employed by the County as a correctional officer at LCP.

14. Defendant Martin Addley was at all times hereto employed by the County as a correctional officer at LCP.

15. Defendant Steven Yearing was at all times hereto employed by the County as a correctional officer at LCP.

16. Defendant Darshan Patel was at all times hereto employed by the County as a correctional officer at LCP.

17. Defendant Nicholas Cimino was at all times hereto employed by the County as a correctional officer at LCP.

18. Defendant Michael Mitchell was at all times hereto employed by the

County as a correctional officer at LCP.

19.    Defendant Kenneth Raymond was at all times hereto employed by the County as a correctional officer at LCP.

20.    Defendant Arthur Noldy was at all times hereto employed by the County as a correctional officer at LCP.

21.    Defendant Officer M. Jones was at all times hereto employed by the County as a correctional officer at LCP.

22.    Defendant Paul Golden was at all times hereto employed by the County as a correctional officer at LCP.

23.    Defendant Robert Mazzino was at all times hereto employed by the County as a correctional officer at LCP.

24.    Defendant Bryan Hughes was at all times hereto employed by the County as a correctional officer at LCP.

25.    Defendant David Kizer was at all times hereto employed by the County as a correctional officer at LCP.

26.    Defendant William Michel was at all times hereto employed by the County as a correctional officer at LCP.

27.    Defendant Trent Antoine was at all times hereto employed by the County as a correctional officer at LCP.

28.    Defendant David Pinkleton was at all times hereto employed by the County as a correctional officer at LCP.

29.    Defendant Christopher Kupinsky was at all times hereto employed by the County as a correctional officer at LCP.

30.    Defendant Tyler Lipinski was at all times hereto employed by the County as a correctional officer at LCP.

31.    Defendant Officer Harina was at all times hereto employed by the County as a correctional officer at LCP

32.    Defendant Robert Horan was at all times hereto employed by the County as a correctional officer at LCP.

33.    Defendant Lee Kaczmarek was at all times hereto employed by the County as a correctional officer at LCP.

34.    Defendant Jerud Loch was at all times hereto employed by the County as a correctional officer at LCP.

35.    Defendant Anthony Wesley was at all times hereto employed by the County as a correctional officer at LCP.

36.    Defendant Franklin Winstead was at all times hereto employed by the County as a correctional officer at LCP.

37.    Defendant Scott Ohmnacht was at all times hereto employed by the County as a correctional officer at LCP.

38.    Defendant Joshua Kilhullen was at all times hereto employed by the County as a correctional officer at LCP.

39.    Defendant Nathan Davis was at all times hereto employed by the County

as a correctional officer at LCP.

40.    Defendant Joshua Sarnoski was at all times hereto employed by the County as a correctional officer at LCP.

41.    Defendant Kyle Mulrain was at all times hereto employed by the County as a correctional officer at LCP.

42.    Defendant Tayler Locker was at all times hereto employed by the County as a correctional officer at LCP.

43.    Defendant Gary Kozlowski was at all times hereto employed by the County as a correctional officer at LCP.

44.    Defendant Officer Caramono was at all times hereto employed by the County as a correctional officer at LCP.

45.    Defendant Anthony Yerka Jr. was at all times hereto employed by the County as a correctional officer at LCP.

46.    Defendant John Dodgson was at all times hereto employed by the County as a correctional officer at LCP.

47.    Defendant Kevin Dolphin was at all times hereto employed by the County as a correctional officer at LCP.

48.    Defendant William Zindle was at all times hereto employed by the County as a correctional officer at LCP.

49.    Defendant Shamus McAndrew was at all times hereto employed by the County as a correctional officer at LCP.

7

50.    Defendant Robert Dutkevitch was at all times hereto employed by the County as a correctional officer at LCP.

51.    Defendant Pat Golden was at all times hereto employed by the County as a correctional officer at LCP.

52.    Defendant Jason Ortona was at all times hereto employed by the County as a sergeant at LCP.

53.    Defendant Officer M. Lord was at all times hereto employed by the County as a correctional officer at LCP.

54.    Defendant Chad Bidwell was at all times hereto employed by the County as a correctional officer at LCP.

55.    Defendant Katie Pernot was at all times hereto employed by Wellpath, LLC as a nurse practitioner at LCP.

56.    Defendant Laverne Garretson was at all times hereto employed by Wellpath as a nurse at LCP.

57.    Defendant Kimberly Stewart was at all times hereto employed by Wellpath as a nurse at LCP.

58.    Defendant Michele Jones was at all times hereto employed by Wellpath as a nurse at LCP.

59.    Defendant Samantha Brown was at all times hereto employed by Wellpath as a nurse at LCP.

60.    Defendant Brandee McCarthy was at all times hereto employed by

Wellpath as a nurse at LCP.

61.    Defendant Holly Bagaski was at all times hereto employed by Wellpath as a nurse at LCP.

62.    Defendant Amanda Trzeniowski was at all times hereto employed by Wellpath as a nurse at LCP.

63.    Defendant Jada Greenfield was at all times hereto employed by Wellpath as a nurse at LCP.

64.    Defendant Devin McAndrew was at all times hereto employed by Wellpath as a nurse at LCP.

65.    Defendant Jenise Collins was at all times hereto employed by Wellpath as a nurse at LCP.

66.    Defendant Jessica Delgado-Days was at all times hereto employed by Wellpath as a nurse at LCP.

67.    Defendant Stephanie Lockhart was at all times hereto employed by Wellpath as a nurse at LCP.

68.    Nominal Defendant Wellpath Holdings, Inc. Liquidating Trust, Matthew J. Dundon, Trustee, is a Nominal Defendant hereto given Wellpath, LLC's bankruptcy discharge by the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

69.    Specifically, by Order dated June 4, 2025, the Bankruptcy Court stated: "Holders of personal injury tort and wrongful death claims against the Debtors

9

[including Wellpath, LLC] are subject to the Trust Distribution Procedures ("TPDs"), including the non-binding alternative dispute resolution process set forth therein to determine, if necessary, the allowed amount for their Claim. ***Such holders of personal injury tort and wrongful death claims may also seek determinations of the Debtors' liability by the appropriate civil court pursuant to 28 U.S.C. § 157(b)(5) with the Liquidating Trust as a nominal party*** (a) to the extent such inclusion is necessary to recover against available third-party insurance proceeds or an unreleased non-Debtor Defendant or ***(b) to establish or liquidate the amount of their claim for distribution under the Plan from the Liquidating Trust***; *provided*, *however*, outside of the Pro Rata distribution from the Liquidating Trust as well as recovery from any applicable insurance plan, the Holders of such claims may not seek satisfaction of, and are permanently enjoined from seeking payment of, any judgment, award, settlement, claim, distribution, indemnification right, or any other payment amount resulting from their lawsuit from, or in connection with, the Debtors, the Debtors' estates, or the Post-Restructuring Debtors." (bold added).

## **FACTUAL BACKGROUND**

### Mr. Rouse's Columbia County Prison Commitment

70.     On or about March 22, 2023, Mr. Rouse was committed to the Columbia County Prison ("CCP") pursuant to charges brought against him emanating from Sullivan County.

71.    When Mr. Rouse entered CCP, prison medical records indicate that he weighed 345 pounds.

72.    During his incarceration at CCP, Mr. Rouse was documented with numerous medical issues, including, *inter alia*, diabetes, TB, fungal infections, and cellulitis.

73.    On or about April 14, 2023, a mental health evaluation was completed at CCP for Mr. Rouse.

74.    That mental health screening documented a concern that Mr. Rouse was deteriorating due to dementia.

75.    On April 19, 2020, Mr. Rouse met with Brian Klock, a mental health counselor at CCP, who documented that his clinical diagnosis remains uncertain.

76.    On April 20, 2023, Mr. Rouse had his initial psychological evaluation at which time he was diagnosed as bipolar and with other specified personality disorder.

77.    On April 30, 2023, Mr. Rouse was evaluated by Shawn McLaughlin, MD.

78.    Dr. McLaughlin noted that Mr. Rouse had "sores on both heals and dorsum of the L 2nd toe.  He has been non-compliant with his Rx.  Reportedly agreed to his Rx again this morning."

79.    On Mr. Rouse's extremities, Dr. McLaughlin observed "some chronic venous statis changes of both LE.  Has crust wound on dorsum of the L 2nd toe.  No discharge.  Little-no erythema appreciated.  DP pulses are 2+ b/l.  Has some crusted wounds on posterior heels, bll."

80.    As to his plan, Dr. McLaughlin "[a]dvised inmate to resume compliance with ALL Rx.  Continue Keflex as ordered for the skin wounds.  Inmate not great candidate for county prison without infirmary, etc.  Continue encouragement of Rx compliance and consider transfer to facility more appropriate for his co-morbid needs."

81.    Throughout May 2023, Mr. Rouse was treated at CCP for wounds on his toes and feet.

82.    On or about May 30, 2023, slightly over two months after he entered CCP, Mr. Rouse weighed 272 pounds, *i.e.*, since incarceration he lost over 70 pounds.

83.    Treatment on Mr. Rouse's toe wounds continued at CCP into June 2023.

84.    On June 19, 2023, Mr. Rouse was admitted to Geisinger Danville for an evaluation for an infection on his left knee and left toe, and an abscess on his buttocks.

85.    Following a history, physical examination, and evaluation, Dr. Robert J. Strony's differential diagnosis for Mr. Rouse included, but was not limited to, sepsis, left gluteal abscess, left knee cellulitis, left knee septic arthritis, and osteomyelitis of the left second toe.

86.     A sepsis alert was called for Mr. Rouse and he was started on vancomycin and Zosyn.

87.     Ultimately, the principal diagnosis was soft tissue abscess of the left glute.

88.     Mr. Rouse was transferred from Geisinger to CCP on June 25, 2023 with specific instructions regarding wound care and follow-up with outpatient wound care, and those instructions were in Mr. Rouse's files at CCP.

Columbia County Prison's Inability to Care for Mr. Rouse's Medical Conditions

89.     It became evident to multiple Columbia County officials and others during Mr. Rouse's incarceration that CCP lacked the capacity or ability to treat Mr. Rouse's various medical issues.

90.     For example, by early May 2023, CCP Warden George Nye expressed to Candace Chilson, a Case Manager employed by Sullivan County, that he wanted Mr. Rouse transferred because of his medical conditions.

91.     On Wednesday, May 10, 2023, the Honorable Russell D. Shurtleff ordered a competency evaluation for Mr. Rouse and indicated that Mr. Rouse would be transferred as soon as possible pending the outcome of that evaluation.

92.     On or about Tuesday, June 20, 2023, Ms. Chilson met with the Sullivan County Commissioners and District Attorney and the District Attorney "agreed that she w[ould] support him being moved to a nursing home that has a locked floor."

93.     On June 21, 2023, Mr. Rouse's attorney filed a petition with the Court to have Mr. Rouse transferred to another facility.

94.     On June 27, 2023, Dr. McLaughlin completed a medical evaluation form for the Columbia-Montour Area on Aging wherein he confirmed what had been obvious for months to officials at CCP -- **Mr. Rouse's medical needs could not be met within the confines of a county prison**.

95.     Dr. McLaughlin therefore recommended that Mr. Rouse be placed in a Nursing Facility.

96.     In that form, Dr. McLaughlin documented the primary reason being AFib, and the secondary being skin wounds.

97.     Dr. McLaughlin further noted that Mr. Rouse's prognosis was "Deteriorating" and that his rehabilitation potential was "Limited."

98.     On Wednesday, June 28, 2023, Ms. Chilson indicated in writing that the CCP "Warden seriously wants him out of the prison," and Ms. Chilson wrote that she was "seeking a jail with an infirmary, so he has access to doctors and medical care 24/7."

99.     Ms. Chilson went on to explain that she had "numerous discussions with our commissioners, the district attorney, the Warden . . . it is a mess honestly.  I am advocating for him to be moved to a jail with an infirmary until I can find him appropriate placement in a nursing environment."

<u>Mr. Rouse's Lackawanna County Prison Commitment</u>

100.    Against this backdrop and knowing full well of Mr. Rouse's physical and mental health diagnoses, on or about June 29, 2023, Lackawanna County chose to accept Mr. Rouse as an inmate at LCP.

101.    In Ms. Chilson's words, LCP "has a medical unit and is fully aware of Jim's diagnoses… both physical and mental health."

102.    On or about July 3, 2023, Mr. Rouse was transferred from CCP to LCP.

103.    Prior to his arrival at LCP, Colleen Orzel, the Deputy Warden of Operations at LCP, emailed prison booking, Warden Timothy Betti, Deputy Warden David Pigga, Paul Vecerkauskas, and Wellpath employees India Smith and L. Sincavage: "FYI – Inmate James Rouse is being transported here from Columbia County.  We will be housing him for Sullivan County.  He should be housed in the SNU [Special Needs Unit] and will arrive with essential medications.  I am told that they will arrive late this morning/lunchtime."

104.    At the time of Mr. Rouse's transfer to LCP, LCP staff and medical personal at LCP were provided Mr. Rouse's complete CCP medical file by Columbia County.

105.    At the time of the events at issue, Wellpath, LLC was the contracted provider for medical care at LCP.

106.    On July 3, 2023, a Medical Receiving Triage was completed for Mr.

Rouse by Marianna Vanderburg, a Wellpath nurse, which stated that he had diabetes and hypertension, was a transfer from Columbia County, and he had multiple medications.

107.    The Receiving Screening also completed that day by Wellpath nurse Nola Spain-Jefferson indicated Mr. Rouse had chronic atrial fibrillation and musculoskeletal idiopathic gout, that he was bipolar, and it also documented that Mr. Rouse weighed 246 pounds at the time.

108.    From the beginning of his incarceration at LCP, Mr. Rouse exhibited bizarre behavior reflecting his rapidly deteriorating mental condition.

109.    For example, on July 6, 2023, Officer Canaveri observed Mr. Rouse in his cell in the Special Needs Unit doing his laundry by placing his clothing in a urine filled toilet.

110.    The following week, on July 13, 2023, Officer Canaveri observed Mr. Rouse attempting to exit his cell without pants.

111.    During his time at LCP, Mr. Rouse continued to suffer with open wounds and sores.

112.    On or about October 19, 2023, Mr. Rouse filed a request for health services regarding a cist on the back of his thigh that had a black tip and was very sore.

113.    On October 25, 2023, Mr. Rouse had a "Chronic Care Initial Visit for

Multiple Medical Problems" with Dr. Jihad Charabati.

114.    Dr. Charabati documented, *inter alia*, abnormal skin/extremities and that he had "2 skin lesions healing post thighs."

115.    Dr. Charabati also noted that Mr. Rouse had Type 2 Diabetes, was adherent to medications, and had "slow healing sores on legs or feet."

116.    Dr. Charabati prescribed Mr. Rouse mupirocin ointment to be given twice daily until November 4, 2023.

117.    On November 22, 2023, Mr. Rouse was documented as having used racially inappropriate language towards other inmates in the SNU by Officer Canevari.

118.    Officer Canevari also documented that Mr. Rouse's "behavior has continually been a disruption to the unit.  He has been CTC'D numerous times for he [sic] actions but continues to illustrate odd behavior."

119.    The following day, November 23, 2023, Mr. Rouse purportedly told Officer Zemantauski that he was going to hit him with a food tray if he entered his cell.

120.    Based on this purported threat, Mr. Rouse was escorted in wrist restraints to Delta unit, *i.e.*, the Restricted Housing Unit ("RHU"), by Sergeant Ortona and Officer Dolphin.

121.    Despite determining that Mr. Rouse needed to be housed in the Special Needs Unit when the County chose to accept his transfer from CCP in July 2023, on November 23, 2023, Mr. Rouse was moved to a cell in the RHU, and he remained celled in the RHU for the next (and last) final five weeks of his incarceration.

122.    For both the November 22, 2023 and November 23, 2023 incidents, Mr. Rouse was given disciplinary offenses.

123.    With respect to the November 22, 2023 incident, Mr. Rouse was alleged to have violated the following rules: creating a disturbance; insulting language; abusive language to staff; insolence; and repeated Class II misconduct.

124.    Mr. Rouse was found guilty of all disciplinary charges, and Mr. Rouse was given fourteen days in the RHU as discipline.

125.    Regarding the November 23, 2023 incident, Mr. Rouse was alleged to have violated rules relating to threats (engage/inflict harm) and creating a disturbance.

126.    Mr. Rouse was found guilty of all charges regarding the November 23, 2023 incident, and Mr. Rouse was given twenty-one days in the RHU as discipline.

127.    Pursuant to the Board's findings, Mr. Rouse was to be housed in the RHU until December 25, 2023.

128.    From the time he was placed in the RHU on November 23, 2023 until he was ultimately transferred to Geisinger Community Medical Center (GCMC) in Scranton on December 27, 2023, Mr. Rouse's physical and mental condition rapidly

18

declined.

129.    All correctional officers who were stationed at the RHU over this five-week period encountered Mr. Rouse, knew he was suffering from a serious medical condition related to his open wounds, knew that Mr. Rouse's physical and mental condition were deteriorating, and were aware of and/or had reason to believe that Mr. Rouse was not receiving any treatment and/or was being mistreated, but these corrections officers did nothing and chose to allow Mr. Rouse to decline to a point where he was beyond saving.

130.    Prior to his transfer to the RHU, Mr. Rouse was not receiving any wound care because his infections were under control; however, within days of being placed in the RHU, Mr. Rouse's wounds became infected, yet the status of his wounds was not checked and he did not receive any wound care for his feet or legs at any point while he was in the RHU.

131.    During this five-week span, despite his declining medical state, Mr. Rouse was never physically examined by Wellpath nurses; instead, he was only specifically assessed twice through the wicket in the door by a nurse as detailed below.

132.    At most, on December 11, 2023, medical personnel examined Mr. Rouse's right cheek, and on December 26, 2023, Mr. Rouse's left leg was viewed. Both interactions came with medical personnel from outside Mr. Rouse's cell with the nurse looking through the wicket in the door.

133.    On December 11, 2023, Mr. Rouse was "seen at the wicket in the door at his cell for right cheek abscess" by Nurse Practitioner Katie Pernot.

134.    Mr. Rouse conveyed to Nurse Pernot on December 11, 2023 that he did not know what was going on, but he needed something to help.

135.    Nurse Pernot documented "[r]ight cheek swollen at time of interaction. Without drainage at this time.  Vital's not obtained at time due to unexpected interaction with patient.  Bactrim x's 5 days."

136.    Nurse Pernot did not conduct a follow-up examination or assessment of Mr. Rouse after December 11, 2023.

137.    Over the next two weeks, Mr. Rouse's mental and physical health deteriorated rapidly; specifically, Mr. Rouse developed open wounds and sores on his feet and legs.

138.    Despite repeated complaints from Mr. Rouse regarding the open sores and wounds on his feet and legs, and his obvious mental decline, from December 12, 2023 until December 26, 2023, not a single medical provider treated Mr. Rouse's wounds and sores, did not physically examine Mr. Rouse, and instead chose to let Mr. Rouse deteriorate to a point that he developed septic shock and died.

139.    Mr. Rouse's deteriorating condition between December 12, 2026 and December 26, 2026 was all specifically witnessed but not treated by the following medical personnel at LCP: Nurse Pernot; Nurse Garretson; Nurse Stewart; Nurse

Jones; Nurse Brown; Nurse McCarthy; Nurse Bagaski; Nurse Trzeniowski; Nurse Greenfield; Nurse McAndrew; Nurse Collins; and Nurse Delgado-Days.

140.    On December 26, 2023, Nurse Pernot assessed Mr. Rouse "through wicket of door due to Sgt. making medical aware of swelling and redness to patients left foot.  Patient is a poor historian and is unable to give details about left foot.  Patient states he was not able to walk over to the door at the time of the visit."

141.    Nurse Pernot documented that Mr. Rouse had redness, pain and swelling in left foot and Bactrim was ordered, but his "vitals were not done due to patient refusing to walk over to door."

142.    Nurse Pernot noted that Mr. Rouse had acute integumentary cellulitis of the lower left limb.

143.    On December 27, 2023, Mr. Rouse was taken to the medical department in a stair chair because he could not stand or walk.

144.    At the medical department, Nurse Pernot noted that Mr. Rouse had "a rapid decline in mental status since yesterday and is unable to form a sentence or to follow simple directions during exam.  +4 edema from toes to knee on left leg, patient refused medications.  C.O.'s needed to use the stair chair to bring patient over due to him being unable to stand and walk to medical unit."

145.    Mr. Rouse was taken to the hospital on December 27, 2023, but from November 23, 2023 until December 27, 2023, none of the Correctional Officers

21

assigned to the RHU did anything regarding Mr. Rouse's failing medical condition.

146.    In particular, during the last approximately two weeks of Mr. Rouse's life, his condition deteriorated rapidly as a result of his wounds and the resulting infections therefrom.

147.    From December 12, 2023 until December 27, 2023, correctional staff were aware that Mr. Rouse needed medical care, knew that he was not being treated by medical staff, knew that Mr. Rouse's hygiene deteriorated because of his inability to leave his cell to shower, and knew that Mr. Rouse was unable to ambulate in his cell due to the untreated wounds on his legs and feet.

148.    All of the following Correctional Officers chose to do nothing to assist Mr. Rouse: Officer C. Noldy; Officer Myers; Officer Gorton; Officer Gervasi; Officer Jordan; Officer Laboranti, Jr.; Officer Gething; Officer Addley; Officer Yearing; Officer Patel; Officer Cimino; Officer Mitchell; Officer Raymond; Officer A. Noldy; Officer Matthew Jones; Officer Micheal Jones; Officer Golden; Officer Mazzino; Officer Hughes; Officer Kizer; Officer Michel; Officer Turner; Officer Antoine; Officer Pinkleton; Officer Kupinsky; Officer Lipinski; Officer Harina; Officer Horan; Officer Kaczmarek; Officer Loch; Officer Wesley; Officer Winstead; Officer Ohmnacht; Officer Kilhullen; Officer Davis; Officer Sarnoski; Officer Mulrain; Officer Locker; Officer Kozlowski; Officer Caramono; Officer Yerka, Jr.; Officer Dodgson; Officer Dolphin; Officer Zindle; Officer McAndrew; Officer Dutkevitch;

Officer Golden; Sergeant Ortona; Officer M. Lord; and Officer Bidwell (collectively, "Individual Correctional Officer Defendants").

149.    From December 12, 2023 until December 27, 2023, medical staff were aware that Mr. Rouse needed medical care, knew that Mr. Rouse was suffering with open wounds and sores on his legs and feet, that Mr. Rouse was unable to ambulate in cell due to the untreated wounds on his legs and feet, and that Mr. Rouse's hygiene deteriorated because he was unable to leave his cell to shower, yet all of the following nurses chose to do nothing to assist Mr. Rouse: Nurse Pernot, Nurse Garretson, Nurse Stewart, Nurse Jones, Nurse Brown, Nurse McCarthy, Nurse Bagaski, Nurse Trzeniowski, Nurse Greenfield, Nurse McAndrew, Nurse Collins, and Nurse Delgado-Days (collectively, "Individual Nurse Defendants").

150.    Mr. Rouse was transported to Geisinger Community Medical Center ("GCMC") on December 27, 2023 at approximately 1:00 p.m.

151.    Mr. Rouse presented to the emergency department for evaluation of altered mental status as well as pain to his left foot, ankle, and toes.

152.    Upon arrival at the hospital, correctional officers informed hospital staff that Mr. Rouse "mentation had been on a decline for at least the past 1 week."

153.    Based on information and belief, that statement was made by Officers Bidwell and M. Lord.

154.    Mr. Rouse was admitted to GCMC for acute cellulitis in his left lower

extremity and delirium.

155.    Mr. Rouse was pronounced dead at GCMC on December 29, 2023 at 10:32 a.m. with clinical diagnoses of "severe septic shock secondary to left lower extremity cellulitis."

156.    In an autopsy performed at Geisinger, it was reported that "[t]he major autopsy findings were acute myocardial ischemia, pulmonary edema, and ischemic colitis.  Most likely cause of his demise was septic shock that resulted in multiorgan failure."

<u>COUNT ONE</u>
Denial of Medical Care
Mr. Inch v. "Individual Correctional Officer Defendants"
(42 U.S.C. § 1983)

157.    Mr. Inch repeats and realleges each and every allegation contained above as if fully repeated herein.

158.    Mr. Rouse, as an inmate and pretrial detainee at LCP, had a constitutional right to adequate medical care under the Fourteenth Amendment to the United States Constitution.  To the extent Mr. Rouse was instead a convicted prisoner, he had a constitutional right to adequate medical care under the Eighth Amendment to the United States Constitution.

159.    Mr. Rouse had serious medical needs throughout his confinement in LCP from July 2023 through December 27, 2023 when he was transferred to a hospital emergency room.

160.    Mr. Rouse's serious medical needs included lesions and sores on his feet and legs, Hepatitis C, mental health disorders such as bipolar disorder, AFib and gout.

161.    Mr. Rouse's serious medical needs worsened during the last month or so of his life when he was relocated from the SNU to the RHU.

162.    During his month in the RHU prior to his death and in particular from December 12, 2023 to December 27, 2023, Mr. Rouse's physical condition and mental status both rapidly deteriorated.

163.    Mr. Rouse's need for medical attention during his time in the RHU and in particular from December 12, 2023 to December 27, 2023 was so obvious that a lay person would have recognized the necessity for that treatment and the need for Mr. Rouse to be examined by a medical provider and/or transferred to a hospital.

164.    During the last approximately two weeks Mr. Rouse spent at LCP in the RHU, all Individual Correctional Officer Defendants observed and interacted with Mr. Rouse, witnessed that he was not receiving any medical care, saw that he was unable to walk or come to the door to receive medication, knew that Mr. Rouse could not shower or bathe, and knew that nursing staff was not treating Mr. Rouse based on his inability to walk to his cell door, but all of the Individual Correctional Officer Defendants chose to do nothing to aid Mr. Rouse's worsening condition.

165.    During those times, Mr. Rouse was suffering with untreated open wounds, cellulitis, swelling and redness in his left lower leg, and sepsis.

166.    Each Individual Correctional Defendant observed Mr. Rouse needing

medical attention, knew he was not being treated, and chose to do nothing.

167.    Specifically, Defendant Officer M. Jones observed that Mr. Rouse needed medical treatment and Officer M. Jones knew that Mr. Rouse was not being cared for or treated on several occasions, including shifts on December 14, 2023, December 15, 2023, December 16, 2023, December 17, 2023, December 18, 2023, December 21, 2023, December 22, 2023, December 23, 2023, December 24, 2023, December 25, 2023, and December 27, 2023.

168.    Yet, despite the opportunity to do so on each and every one of those shifts, Defendant Officer M. Jones chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

169.    Defendant Officer Jordan observed that Mr. Rouse needed medical treatment and Officer Jordan knew that Mr. Rouse was not being cared for or treated on several occasions, including shifts on December 12, 2023, December 13, 2023, December 14, 2023, December 18, 2023, December 19, 2023, December 20, 2023, December 21, 2023, December 24, 2023, and December 25, 2023.

170.    Yet, despite the opportunity to do so on each and every one of those shifts, Defendant Officer Jordan chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

171.    Defendant Officer Michel observed that Mr. Rouse needed medical treatment and Officer Michel knew that Mr. Rouse was not being cared for or treated on several occasions, including shifts on December 12, 2023, December 13, 2023,

December 14, 2023, December 15, 2023, December 17, 2023, December 19, 2023, December 20, 2023, December 21, 2023, December 25, 2023, and December 26, 2023.

172.    Yet, despite the opportunity to do so on each and every one of those shifts, Defendant Officer Michel chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

173.    Defendant Officer Yearing observed that Mr. Rouse needed medical treatment on December 13, 2023, December 14, 2023, December 15, 2023, and December 22, 2023 knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Yearing chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

174.    Defendant Officer Myers observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023 and the night of December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Myers chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

175.    Defendant Officer Gorton observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 14, 2023, December 17, 2023, December 18, 2023, December 19, 2023, December 20, 2023, December 24, 2023, December 25, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant

Officer Gorton chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

176.    Defendant Officer Gervasi observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 14, 2023, December 19, 2023, December 20, 2023, December 21, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Gervasi chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

177.    Defendant Officer Laboranti, Jr. observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 14, 2023, December 15, 2023,   December 20, 2023, December 21, 2023, December 22, 2023, and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Laboranti, Jr. chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

178.    Defendant Officer Gething observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 14, 2023, December 15, 2023, December 16, 2023, December 17, 2023, December 20, 2023, December 21, 2023, December 22, 2023, and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Gething chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

179.    Defendant Officer Addley observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 14, 2023, December 15, 2023, December 16, 2023, December 19, 2023, December 20, 2023, December 21, 2023, December 22, 2023, December 23, 2023, December 26, 2023, and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Addley chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

180.    Defendant Officer Mitchell observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023 and December 14, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Mitchell chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

181.    Defendant Officer Cimino observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 15, 2023, December 16, 2023, December 17, 2023, December 20, 2023, December 21, 2023, December 22, 2023, December 23, 2023, and December 24, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Cimino chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

182.    Defendant Officer Patel observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023, December 19, 2023, December 21, 2023,

and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Patel chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

183.    Defendant Officer Raymond observed that Mr. Rouse needed medical treatment on shifts on December 13, 2023 and December 21, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Raymond chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

184.    Defendant Officer C. Noldy observed Mr. Rouse's need for medical treatment on shifts on December 13, 2023, December 16, 2023, December 18, 2023, December 19, 2023, December 20, 2023, December 23, 2023, December 24, 2023, December 25, 2023, and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer C. Noldy chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

185.    Defendant Officer A. Noldy observed that Mr. Rouse needed medical treatment on shifts on December 14, 2023 and December 15, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer A. Noldy chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

186.    Defendant Officer Paul Golden observed that Mr. Rouse needed medical

treatment on shifts on December 15, 2023, December 16, 2023, December 22, 2023, and December 23, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Paul Golden chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

187.    Defendant Officer Mazzino observed that Mr. Rouse needed medical treatment on shifts on December 15, 2023, December 16, 2023, December 17, 2023, December 19, 2023, December 23, 2023, December 25, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Mazzino chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

188.    Defendant Officer Kizer observed that Mr. Rouse needed medical treatment on shifts December 15, 2023 and December 22, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Kizer chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

189.    Defendant Officer Hughes observed Mr. Rouse's need for medical treatment on shifts on December 15, 2023, December 18, 2023, December 25, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Hughes chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

190.    Defendant Officer Antoine observed Mr. Rouse's need for medical

treatment on December 16, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Antoine chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

191.    Defendant Officer Pinkleton observed that Mr. Rouse needed medical treatment on December 16, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Pinkleton chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

192.    Defendant Officer Kupinsky observed Mr. Rouse's need for medical treatment on shifts on December 16, 2023, December 18, 2023, December 20, 2023, December 23, 2023, December 25, 2023 and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Kupinsky chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

193.    Defendant Officer Lipinski observed Mr. Rouse's need for medical treatment on shifts on December 16, 2023, December 17, 2023, December 18, 2023, December 19, 2023, December 20, 2023, December 23, 2023, December 24, 2023, December 25, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically

and mentally, yet, despite the opportunity to do so, Defendant Officer Lipinski chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

194.    Defendant Officer Harina observed Mr. Rouse's need for medical treatment on December 17, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Harina chose to do nothing to assist Mr. Rouse despite his obvious need for medical care

195.    Defendant Officer Horan observed Mr. Rouse's need for medical treatment on December 17, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Horan chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

196.    Defendant Officer Kaczmarek observed Mr. Rouse's need for medical treatment on shifts on December 17, 2023, December 18, 2023, and December 24, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Kaczmarek chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

197.    Defendant Officer Loch observed Mr. Rouse's need for medical treatment on December 18, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Loch chose to do nothing to

assist Mr. Rouse despite his obvious need for medical care.

198.    Defendant Officer Wesley observed Mr. Rouse's need for medical treatment on December 18, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Wesley chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

199.    Defendant Officer Winstead observed Mr. Rouse's need for medical treatment on December 18, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Winstead chose to do nothing to assist Mr. Rouse despite his obvious need for medical care,

200.    Defendant Officer Ohmnacht observed Mr. Rouse's need for medical treatment on shifts on December 19, 2023, December 24, 2023, and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff, yet, despite the opportunity to do so, Defendant Officer Ohmnacht chose to do nothing to assist Mr. Rouse despite his obvious need for medical.

201.    Defendant Officer Kilhullen observed Mr. Rouse's need for medical treatment on December 19, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Kilhullen chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

202.    Defendant Officer Davis observed Mr. Rouse's need for medical treatment on December 19, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Davis chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

203.    Defendant Officer Sarnoski observed Mr. Rouse's need for medical treatment on shifts on December 20, 2023, December 22, 2023, and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Sarnoski chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

204.    Defendant Officer Mulrain observed Mr. Rouse's need for medical treatment on shifts on December 20, 2023 and December 23, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Mulrain chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

205.    Defendant Officer Locker observed Mr. Rouse's need for medical treatment on December 21, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Locker chose to do nothing to

assist Mr. Rouse despite his obvious need for medical care.

206.    Defendant Officer Kozlowski observed Mr. Rouse's need for medical treatment on December 21, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Kozlowski chose to do nothing to assist Mr. Rouse despite his obvious need for medical care

207.    Defendant Officer Dolphin observed Mr. Rouse's need for medical treatment on December 22, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Dolphin chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

208.    Defendant Officer Caramono observed Mr. Rouse's need for medical treatment on December 21, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Caramono chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

209.    Defendant Officer Zindle observed Mr. Rouse's need for medical treatment on December 22, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Zindle chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

210.    Defendant Officer Yerka observed Mr. Rouse's need for medical treatment on shifts on December 22, 2023 and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Yerka chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

211.    Defendant Officer McAndrew observed Mr. Rouse's need for medical treatment on December 24, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer McAndrew chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

212.    Defendant Officer Dutkevitch observed Mr. Rouse's need for medical treatment on December 24, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Dutkevitch chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

213.    Defendant Officer Pat Golden observed Mr. Rouse's need for medical treatment on shifts on December 25, 2023 and December 26, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Pat Golden chose to do nothing to assist Mr. Rouse despite his obvious need

for medical care

214.    Defendant Officer Dodgson observed Mr. Rouse's need for medical treatment on shifts on December 26, 2023 and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer Dodgson chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

215.    Defendant Sergeant Ortona observed Mr. Rouse's need for medical treatment on shifts on December 13, 2023, December 14, 2023, December 15, 2023, December 19, 2023, December 21, 2023December 26, 2023 and December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Sergeant Ortona chose to do nothing to assist Mr. Rouse despite his obvious need for medical care.

216.    Defendant Officer M. Lord observed Mr. Rouse's need for medical treatment on December 27, 2023, knew that Mr. Rouse was not being cared for or treated by medical staff and that Mr. Rouse was deteriorating physically and mentally, yet, despite the opportunity to do so, Defendant Officer M. Lord chose not to call 911 and did not assist Mr. Rouse despite his obvious need for medical care.

217.    Defendant Officers Bidwell and Davis observed Mr. Rouse's need for medical treatment on multiple occasions, and, based on information and belief, were

the initial officers guarding Mr. Rouse at the hospital at which time both informed hospital staff that Mr. Rouse had been rapidly declining for at least a week.

218.     Mr. Rouse repeatedly asked the on-duty officers in the RHU, including the Individual Correctional Officer Defendants, to send him to the infirmary for treatment, to have medical visit him in his cell because of the symptoms he was experiencing, or to send him to the hospital, but they refused and did nothing.

219.     On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants were staffed to Delta unit, *i.e.*, the RHU, where Mr. Rouse was housed.

220.     On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants knew about the state of Mr. Rouse's worsening condition and the lack of medical treatment, but none of them sent him to the medical department for examination or requested the medical department to come to his cell.

221.     On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants conducted rounds on the Delta unit, *i.e.*, the RHU, observed that Mr. Rouse could not ambulate and knew that Mr. Rouse had not left his cell for days because of an inability to stand or walk.

222.     On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants knew

that Mr. Rouse's deteriorating physical and mental condition meant he did not shower or bathe himself at all for, at least, the last two weeks of his life.

223.    On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants knew that Mr. Rouse did not receive any care for the wounds and sores on his feet and legs.

224.    On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants knew that the policy and custom of the medical providers was that if an inmate in the RHU did not come to the wicket at their door, the inmate would receive no medical treatment and would not receive medications.

225.    On each and every shift Individual Correctional Officer Defendants worked on the dates set forth above, Individual Correctional Officer Defendants observed that Mr. Rouse did not receive medical care or medications because he was unable to walk to the cell door.

226.    For each of these reasons, all of the Individual Correctional Officer Defendants were deliberately indifferent to Mr. Rouse's serious medical needs in violation of Mr. Rouse's rights guaranteed by the Eighth and/or Fourteenth Amendment to the United States Constitution.

227.    As a result of the Individual Correctional Officer Defendants' violations of Mr. Rouse's constitutional rights and their deliberate indifference to same, he suffered extreme pain and emotional distress; worsening infection; and the ultimate

injury -- death.

## COUNT TWO
Denial of Medical Care
Mr. Inch v. "Individual Nurse Defendants"
(42 U.S.C. § 1983)

228.    Mr. Inch repeats and realleges each and every allegation contained above as if fully repeated herein.

229.    Mr. Rouse, as an inmate and pretrial detainee at LCP, had a constitutional right to adequate medical care under the Fourteenth Amendment to the United States Constitution.  To the extent Mr. Rouse was instead a convicted prisoner, he had a constitutional right to adequate medical care under the Eighth Amendment to the United States Constitution.

230.    Mr. Rouse had serious medical needs throughout his confinement in LCP from July 2023 through December 27, 2023 when he was transferred to a hospital emergency room.

231.    Mr. Rouse's serious medical needs included lesions and sores on his feet and legs, Hepatitis C, mental health disorders such as bipolar disorder, AFib and gout.

232.    Mr. Rouse's serious medical needs worsened during the last month or so of his life when he was relocated from the SNU to the RHU.

233.    During his month in the RHU prior to his death and in particular from December 12, 2023 to December 27, 2023, Mr. Rouse's physical condition and mental health both rapidly deteriorated before the eyes of the Individual Nurse Defendants.

234.   Although Mr. Rouse's condition was apparent and his need for medical attention evident, Mr. Rouse was afforded no treatment for the wounds and sores on his legs and feet, and he was left to deteriorate in the RHU.

235.   Indeed, despite developing worsening sores on his feet and legs, Individual Nurse Defendants did nothing, did not treat Mr. Rouse, and chose to leave him to rot in his cell.

236.   During the final two weeks of his life, Mr. Rouse did not leave his cell, did not bathe or shower, and did not (and could not) care for his own personal hygiene.

237.   All Individual Nurse Defendants were aware of Mr. Rouse's poor hygiene (as they all delivered medications to Delta unit, *i.e.*, the RHU) during the final two weeks of Mr. Rouse's life.

238.   When inmates were in the RHU, like Mr. Rouse in December 2023, they did not receive medications or medical treatments unless they walked to the door (and received the treatment or medication through the wicket in the door).

239.   Individual Nurse Defendants all observed that Mr. Rouse did not come to the wicket in his door for medications during the final few weeks of his life, and all observed Mr. Rouse's inability to come to the door by looking at Mr. Rouse through the wicket.

240.   Yet, despite Mr. Rouse's unkempt appearance, his inability to walk to the door, his poor hygiene, and his deteriorating mental health, Individual Nurse Defendants did not go in Mr. Rouse's cell, did not examine the sores and wounds on

his feet and legs, and chose to let Mr. Rouse to physical and mentally fail in his cell without any medical care.

241.  On the morning of December 12, 2023, Defendant Nurse Brown delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

242.  On the evenings of December 12, 2023, December 15, 2023, and December 18, 2023, Defendant Nurse Stewart delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

243.  On the morning of December 13, 2023, December 15, 2023, December 18, 2023, December 19, 2023, December 21, 2023, December 22, 2023, and December 26, 2023, Defendant Nurse McCarthy delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

244.  On the evenings of December 13, 2023 and December 20, 2023, Defendant Nurse McAndrew delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and

sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

245.   On the mornings of December 13, 2023, December 14, 2023, December 15, 2023, December 18, 2023, December 19, 2023, December 21, 2023, December 22, 2023, and December 26, 2023 and the evening of December 17, 2023, Defendant Nurse McCarthy delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

246.   On the morning of December 16, 2023, Defendant Nurse Bagaski delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

247.   On the evening of December 16, 2023 and the morning of December 17, 2023, Defendant Nurse Trzenlowski delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

248.   On the evenings of December 19, 2023, December 21, 2023, and December 23, 2023, Defendant Nurse Greenfield delivered medications to the inmates

in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

249. On the morning of December 20, 2023, Defendant Nurse Delgado-Days delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

250. On the evenings of December 22, 2023, December 25, 2023, and December 26, 2023 Defendant Nurse Collins delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

251. On the morning of December 24, 2023, Defendant Nurse Garretson delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

252. On the morning of December 25, 2023, Defendant Nurse Lockhart delivered medications to the inmates in the RHU and she observed Mr. Rouse through the wicket in his cell door with open wounds and sores on his feet and legs, but she

did nothing and instead chose to allow Mr. Rouse to continue suffering untreated in his cell.

253.    Defendant Nurse Pernot on December 26, 2023 was summoned to Mr. Rouse's cell, witnessed that he had swelling and redness in his left foot, and knew that Mr. Rouse was unable walk to the door at the time of the visit, yet, Defendant Nurse Pernot chose not to take Mr. Rouse's vitals, chose not to physically examine him, chose not to have Mr. Rouse transferred to LCP's infirmary or SNU, and/or chose not to send Mr. Rouse to the hospital despite his obvious need for emergency medical care.

254.    In other words, on December 26, 2023, Nurse Pernot observed Mr. Rouse dying on the floor of his cell, and she chose not to give him any medical attention or medication and simply documented his condition without providing any medical care at all.

255.    On each and every shift Individual Nurse Defendants worked on the dates set forth above, Individual Nurse Defendants delivered medicine to Delta unit, *i.e.*, the RHU, observed that Mr. Rouse could not ambulate and knew that Mr. Rouse had not left his cell for days because of an inability to stand or walk.

256.    On each and every shift Individual Nurse Defendants worked on the dates set forth above, Individual Nurse Defendants knew that Mr. Rouse's deteriorating physical and mental condition meant he did not shower or bathe himself at all for, at least, the last two weeks of his life.

257.    On each and every shift Individual Nurse Defendants worked on the dates set forth above, Individual Nurse Defendants knew that Mr. Rouse was not receiving any care or medication for the wounds and sores on his feet and legs.

258.    On each and every shift Individual Nurse Defendants worked on the dates set forth above, Individual Nurse Defendants knew that policy and custom at LCP was that if an inmate in the RHU did not come to the wicket at their door, the inmate would receive no medical treatment and would not receive prescribed medications.

259.    For each of these reasons, all of the Individual Nurse Defendants were deliberately indifferent to Mr. Rouse's serious medical needs in violation of Mr. Rouse's rights guaranteed by the Eighth and/or Fourteenth Amendments to the United States Constitution.

260.    As a result of the Individual Nurse Defendants' violations of Mr. Rouse's constitutional rights and their deliberate indifference to same, he suffered extreme pain and emotional distress; worsening infection; and the ultimate injury – death.

<u>COUNT THREE</u>
Denial of Medical Care
Mr. Inch v. Lackawanna County & Nominal Defendant the Liquidating Trust
(42 U.S.C. § 1983 (*Monell*))

261.    Mr. Inch repeats and realleges each and every allegation made above as if fully repeated herein.

262.    Mr. Rouse, as an inmate and pretrial detainee at LCP, had a constitutional

right to adequate medical care under the Fourteenth Amendment to the United States Constitution.  To the extent Mr. Rouse was instead a convicted prisoner, he had a constitutional right to adequate medical care under the Eighth Amendment to the United States Constitution.

263.    Mr. Rouse had serious medical needs throughout his confinement in LCP from July 2023 through December 27, 2023 when he was transferred to a hospital emergency room.

264.    Mr. Rouse's serious medical needs included lesions and sores on his feet and legs, Hepatitis C, mental health disorders such as bipolar disorder, AFib and gout

265.    Despite retaining Wellpath to provide medical care at LCP, the County had a non-delegable duty to ensure that all inmates, including Mr. Rouse, received adequate medical care.

266.    Particularly, the County and Wellpath had policies, customs and/or practices related to, *inter alia*, insufficient staffing, failing to provide adequate medical attention for inmates in immediate need of same, failing to provide necessary wound care to inmates, and failing to train employees on diagnosing and/or treating inmates in the need of emergent medical care and transfer to a hospital.

267.    The County's and Wellpath's policy and practice of denying inmates necessary wound care has led to amputation and/or death before, including to Ryan Curtis in February 2022, docketed in this Court at No. 3:23-cv-2092.

268.    The County and Wellpath also had a policy, custom and/or practice of

failing to train, instruct, supervise and/or control their employees in recognizing when emergency medical care is required for inmates.

269.   Such training would have prevented worsening infection and Mr. Rouse's death. The need for such training was obvious.

270.   The County and Wellpath further had a policy, custom and/or practice of keeping inmates in need of emergency medical attention at LCP without transferring those inmates to the hospital because of cost and/or staffing.

271.   The County and Wellpath had a further policy, custom, and practice of not examining or treating inmates in need of medical care if the inmate would not or could not physically ambulate to a nurse or medical provider.

272.   The County's and Wellpath's policies, customs and/or practices were a cause of and moving force behind the violation of Mr. Rouse's Eighth and/or Fourteenth Amendment rights.

273.   The County was also deliberately indifferent to Mr. Rouse's constitutional rights given that the County voluntarily took custody of Mr. Rouse from Columbia County because it had an infirmary but, even though Mr. Rouse was to be housed in the SNU because of his serious medical issues, Mr. Rouse was transferred to the RHU five weeks before his death.

274.   Mr. Rouse was placed in the RHU based on the County's policy or custom of placing all inmates who commit disciplinary infractions in the RHU even though the County took Mr. Rouse under its custody, care, and control knowing that

he could not be safely housed anywhere but the infirmary.

275.    The County therefore violated Mr. Rouse's constitutional rights, and the County is also liable for Wellpath's violations of Mr. Rouse's constitutional rights under the non-delegable duty doctrine.

276.    As a result of the County's violations of Mr. Rouse's constitutional rights and its deliberate indifference to same, he suffered extreme pain and emotional distress; worsening infection; and the ultimate injury -- death.

<u>COUNT FOUR</u>
Americans with Disabilities Act (Title II)
Mr. Inch v. Lackawanna County

277.    Mr. Inch repeats and realleges each and every allegation contained above as if fully repeated herein.

278.    Mr. Rouse was disabled within the meaning of the Americans with Disabilities Act as suffered with lesions and sores on his feet and legs (skin disorders), Hepatitis C, mental health disorders such as bipolar disorder, AFib and gout.

279.    As a result of Mr. Rouse's mental health diagnoses and skin-related disorders, he was a qualified person with a disability under both the ADA and RA.

280.    Mr. Rouse's qualifying disabilities substantially impacted multiple major life activities including, but not limited to, thinking, communicating, and caring for his personal hygiene.

281.    Bipolar disorder is recognized under the ADA's implementing regulations as an impairment that cause a substantial limitation in brain function.

282.   At all times while Mr. Rouse was an inmate at LCP, the County knew that Mr. Rouse suffered with these impairments.

283.   Indeed, prior to his arrival at LCP, Colleen Orzel, the Deputy Warden of Operations at LCP, emailed prison booking, Warden Timothy Betti, Deputy Warden David Pigga, Paul Vecerkauskas, and Wellpath employees India Smith and L sincavage: "FYI – Inmate James Rouse is being transported here from Columbia County.  We will be housing him for Sullivan County.  He should be housed in the SNU [Special Needs Unit] and will arrive with essential medications."

284.   From the time Mr. Rouse arrived at LCP until November 23, 2023, Mr. Rouse was housed in the SNU.

285.   On November 23, 2023, Mr. Rouse was found guilty for two disciplinary incidents, and he was removed from the SNU where, arguably, his medical needs could be attended to, and was placed in the RHU as punishment.

286.   Mr. Rouse was placed in the RHU pursuant to County policy and custom that inmates found guilty of certain disciplinary infractions are transferred to the RHU without exception.

287.   In light of Mr. Rouse's disabilities, a reasonable accommodation of this policy and custom was required under the ADA.

288.   Specifically, a reasonable accommodation of this policy and custom was to continue to house Mr. Rouse in the SNU because he could not be safely cared for at LCP in any other unit.

289.   Instead of making this accommodation, County officials made the conscious choice to move Mr. Rouse to the RHU despite being fully aware that Mr. Rouse could not be cared for effectively in the RHU.

290.   Moreover, the transfer to the RHU was made because of his disability as the actions forming the basis of the disciplinary actions involved Mr. Rouse engaging in bizarre behavior due to his mental health disabilities.

291.   Moving Mr. Rouse to the RHU while knowing of the obvious risks that he could not care for himself on his own demonstrates that the County and its staff were deliberately indifferent to Mr. Rouse's protected rights.

292.   Based on information and belief, the County did not train its staff that inmates needing to be housed in the SNU should not be transferred to the RHU even if they commit a disciplinary infraction.

293.   Had the staff received such training for interacting with inmates like those in Mr. Rouse's physical and mental state, Mr. Rouse would not have been transferred to the RHU and he would not have deteriorated to the point that he died from septic shock.

294.   Defendant Lackawanna County therefore acted with deliberate indifference by failing to properly train its staff to ensure that medically vulnerable inmates in the physical (and mental) condition like Mr. Rouse should not be removed from the SNU except to go to a hospital.

295.   It is obvious that the failure to adequately train staff on that topic will

result in violations of the Americans with Disabilities Act.

296.  Under the ADA, the County is vicariously liable for the acts of its employees.

297.  The County therefore acted with deliberate indifference to Mr. Rouse.

298.  As a result of the County's violation of the Americans with Disabilities Act, Mr. Rouse suffered substantial injuries and death.

COUNT FIVE
Rehabilitation Act
Mr. Inch v. Lackawanna County

299.  Mr. Inch repeats and realleges each and every allegation made above as if fully repeated herein.

300.  The County is an entity that receives federal funding.

301.  The County's actions and inactions as described above violated the Rehabilitation Act.

302.  As a result of the County's violations of the Rehabilitation Act, Mr. Rouse suffered substantial injuries and death.

WHEREFORE, Mr. Inch demands judgment as follows:

A. As to the County, an amount to be determined at trial plus interest;

B. As to all Individual Defendants, *i.e.*, Individual Correctional Officer Defendants and Individual Nurse Defendants, an amount to be determined at trial, including punitive damages against each of them, plus interest;

C. As to the Nominal Defendant, to establish or liquidate the amount of

Plaintiff's claim for distribution under the confirmed Bankruptcy Plan from the Liquidating Trust in accordance with the Bankruptcy Court's June 4, 2025 Order;

D.  For plaintiff attorneys' fees, pursuant to 42 U.S.C. §§ 1988 and 12205 and 29 U.S.C. § 794a;

E.  For the costs and disbursements incurred in this action; and

F.  For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller
/s/ Chad J. Sweigart
Attorneys for Plaintiff
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860

JURY DEMAND

Plaintiff demands a trial by jury.